[Cite as *State v. K.A.C.*, 2024-Ohio-1139.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 23AP-86 |
| | | (C.P.C. No. 20CR-2171) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| [K.A.C.], | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 26, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Darren Burgess*, for appellee.

**On brief:** *Brian J. Rigg*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, K.A.C., appeals from a judgment entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of two counts of rape of a person less than 13 years old in violation of R.C. 2907.02. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On May 22, 2020, appellant was indicted on four counts of rape in violation of R.C. 2907.02, all first-degree felonies. Specifically, Count 1 charged appellant with rape by digital penetration, occurring on or about May 1 to September 1, 2012, when the victim was 8 or 9 years old. Count 2 charged appellant with rape by digital penetration, occurring on or about May 1 to September 1, 2013, when the victim was 9 or 10 years old. Count 3 charged appellant with rape by digital penetration, occurring on or about May 1 to

September 1, 2014, when the victim was 10 or 11 years old.  Count 4 charged appellant with rape by digital penetration, occurring on or about May 1 to September 1, 2015, when the victim was 11 or 12 years old.

{¶ 3}   The matter proceeded to a jury trial commencing December 5, 2022. Plaintiff-appellee, State of Ohio, presented the testimony of O.A. ("the victim"), Jennifer Yasho, a victim intake case worker of the Children Services Division of Jefferson County Department of Job and Family Services, O.A.'s mother, and Officer John Ball with the city of Columbus.

{¶ 4}   O.A. testified that she was born in 2003 and her birthday falls in the middle of the summer.  O.A. was born in Columbus but moved with her mother to another Ohio town when she was five and lived there until she graduated from high school.  O.A. testified that her father stayed in Columbus, and that she would visit him during school breaks, including extended stays during summer breaks when she would visit her father  for weeks or the entire summer break, from around the end of May through August.

{¶ 5}   According to O.A., when she visited her father in Columbus, her father and uncle would work during the day and during that time her father would leave her at her uncle and aunt's apartment. O.A. testified that while other people would be in the apartment when she was dropped off, it was very common for her to end up being left alone with her older cousin, appellant, who she believed lived with her uncle and aunt.  She was not sure where her aunt would be during the day and did not recall other children staying at her aunt's apartment while she was there, although she did recall playing with her cousin, L.W.1, who is roughly her same age.  Occasionally, but not often, O.A.'s siblings would go to her aunt and uncle's apartment too, and when they left to go play at the park, appellant would stay behind with her at the apartment.

{¶ 6}   O.A. testified that appellant began to physically assault her and, beginning in summer 2013, the assaults progressed to become sexual in nature.  Specifically, according to O.A., after everyone left the apartment, appellant would engage in what he called a "game" whereby he hit her and would see how loud she could scream.  (Tr. Vol. II at 107-09.)  When O.A. did not tell anyone about the "game," appellant's conduct "escalated" and became more aggressive and sexual.   (Tr. Vol. II at 109.)  O.A. testified that during the episodes appellant would pin her down, cover her mouth or put his fingers around her neck,

and hit her.  Appellant's conduct became "sexual" shortly after O.A.'s tenth birthday.  (Tr. Vol. II at 107, 113, 123, 134.)  During the first sexual incident, appellant put his fingers "in my private areas. * * * My vagina."  (Tr. Vol. II at 110.)  She was unsure how many times this occurred during summer 2013: "[i]t happened so many times while I was there that it got to the point I lost track."  (Tr. Vol. II at 111.)

{¶ 7}  According to O.A., she did not alert anyone about the assaults due to "fear" and appellant continued to assault her.  (Tr. Vol. II at 113.)  During Christmas break, when she was still 10, she "would either be penetrated with * * * a finger or a genitalia."  (Tr. Vol. II at 130.)  She testified she did not go to her father's house the following summer, in 2014 when she turned 11, but during the next Christmas break appellant again sexually assaulting her.  O.A. testified that the sexual assaults by appellant stopped at some point during summer 2015 because she fought back: "it started to get physical, you know, to the abuse and it went to start to get sexual, however, I fought back and it ended up stopping." (Tr. Vol. II at 133.)

{¶ 8}  O.A. testified that the assaults occurred at her aunt and uncle's apartment in the living room and appellant's bedroom. She was shown photographs of the apartment and she testified to her understanding of the apartment layout, how rooms are connected, and uses of various rooms and spaces.  She identified the bedroom where the incidents occurred and identified appellant in the courtroom as the person who assaulted her.

{¶ 9}  After the sexual assaults stopped, O.A. still did not tell anyone what had occurred—she was "scared" to—but she did not want to visit her father anymore and those visits ceased.  (Tr. Vol. II at 117.)  She ultimately disclosed the sexual assaults to her mother around fall 2019.  Her mother "immediately * * * tried to press charges and get everything situated and for me to seek help."  (Tr. Vol. II at 119.)   Yasho then became involved, and O.A. "told her everything that had happened."  (Tr. Vol. II at 120.)  The video of the discussion between O.A. and Yasho was played for the jury and submitted into evidence.

{¶ 10} On cross-examination, O.A. agreed that when in her aunt and uncle's apartment, you could hear noises from neighbors' apartments.  She testified that during appellant's "game" she would scream "[l]oud enough to where it would sound like a child was playing games.  Just a child scream," and that it was possible neighbors could have heard her.  (Tr. Vol. II at 158-59.)  Asked about appellant hitting her, O.A. specified that

he hit her all over her body, but never did so hard enough to leave bruises. O.A. confirmed that she bit appellant on the penis "hard enough that he got off of me," that appellant then hit her, and the incident prompted the assaults to stop. (Tr. Vol. II at 176-77.) She agreed she disclosed this incident to Yasho. Regarding the disclosure to her mother, O.A. stated her mother pressured her to talk in order to find out "why her child was acting so distant" and agreed her mother wanted to have appellant charged and "go to court." (Tr. Vol. II at 157, 160.) O.A. also agreed she had another relative with the same first name as appellant on her mother's side of the family.

{¶ 11} The state then called Yasho to testify. According to Yasho, after being contacted by O.A.'s mother, she conducted a video-recorded forensic interview with O.A. in December 2019 when O.A. was 16.

{¶ 12} Yasho testified that during the interview, O.A. remained "relatively calm" and cried a little. (Tr. Vol. II at 199.) According to Yasho, O.A. disclosed that her cousin had sexually assaulted her over the course of several years during O.A.'s visitations with her father in Columbus. Specifically, O.A. stated during the interview that her father would drop her off at his residence, which he shared with O.A.'s uncle, for babysitting by her cousin. She stated that although other people came in and out of the apartment no one else would be present when appellant assaulted her. O.A. told Yasho the assaults started when she was about the age of 8 or 9 and continued for about 4 years until the age of 12, which was the last time she had contact with her cousin. O.A. stated that appellant "told her that they would play this fun game called the scream game," which started out with * * * him hitting her * * * and that if she would scream, he would put his hands over her mouth and hold her down." (Tr. Vol. II at 200.) Then, appellant "would use his hands or his private parts to touch her underneath her clothing or take her clothing off and insert his hands or private parts into her private parts." (Tr. Vol. II at 200.) Yasho testified that O.A. stated "on the last time it happened, that he actually put his private part into her mouth and she bit it because she couldn't scream." (Tr. Vol. II at 217.)

{¶ 13} According to Yasho, O.A. was detailed in her disclosure of the sexual assaults but did not identify particular dates the assaults occurred. In Yasho's experience, it is not uncommon for a victim to be unable to recall particular dates when the victim was abused as a child and years pass before they are interviewed. Yasho testified that when a child

chooses to disclose abuse depends on the child. Yasho stated that, after the interview with O.A. ended, she provided a copy of the interview to the Columbus Police Department, and that was the end of her involvement with the case.

{¶ 14} The prosecution then called O.A.'s mother to testify. According to O.A.'s mother, beginning around 2009 O.A. would go to see her father and his side of the family in Columbus during holidays and summer break. The visits to Columbus stopped in 2015 when O.A. was 12 years old and no longer wanted to go to Columbus. After that point, O.A.'s mother noticed that O.A. was more withdrawn, changed her appearance, and had self-esteem issues. O.A.'s mother questioned her about what was going on in her life and, eventually, O.A. disclosed she was raped by her cousin at her aunt's apartment after O.A.'s father left for work and other adults left. O.A.'s mother called police, spoke with Jefferson County Department of Job and Family Services, and found services to help O.A.

{¶ 15} Next, Officer John Ball testified on behalf of the prosecution. According to Officer Ball, in 2019, when he worked in the sexual assault unit, he received a report of a disclosure from O.A. asserting she was sexually assaulted by a relative. He spoke with Yasho from children services, watched the videos of the interview, got a search warrant to photograph the apartment, and interviewed appellant by phone. According to Officer Ball, appellant acknowledged he knew O.A. and they were related, but did not recall his mother babysitting O.A. and denied sexually assaulting her. Officer Ball walked through the apartment himself and agreed the unit was small and "very loud"; there were a lot of people in those apartment units and he had previously responded to noise complaints pertaining to the building. (Tr. Vol. II at 281.) In his opinion, someone would be able to hear loud noises like screaming in the next apartment. Due to the passage of time, he did not talk to other witnesses or collect evidence beyond documenting the layout. He acknowledged it was a mistake to not at least knock on a few doors to see if anyone knew about the alleged incidents.

{¶ 16} At the close of the prosecution's presentation of evidence, the prosecution moved to amend Count 4 of the indictment under Crim.R. 7(D) to reflect evidence that the conduct involved was not digital penetration but instead fellatio. The prosecution additionally moved to admit the video of the interview with children services and

photographs of the apartment. The exhibits were admitted without objection, and the state rested its case.

{¶ 17} Defense counsel moved to acquit appellant, pursuant to Crim.R. 29, arguing the evidence presented by the prosecution was insufficient to sustain the charges. The prosecution conceded there was no evidence to support Count 1, which alleged appellant raped O.A. during summer 2012 when she was 8 and 9 years old. The trial court dismissed Count 1, but denied appellant's motion as to Counts 2, 3, and 4 stating, "[o]bviously, comes down to determinations of credibility, and certainly there is nothing in the testimony that would prevent making it unreasonable for the jury to believe the State's witnesses." (Tr. Vol. III at 298.) Appellant objected.

{¶ 18} The defense then called C.C., a friend of appellant's mother (O.A.'s aunt) and a neighbor, to testify. According to C.C., she moved into the apartment building in about 2011. From 2011 to about 2017, she lived in unit "1A," which was located on "the other side of the building" about four units away and a floor below appellant's mother's apartment. (Tr. Vol. III at 337, 341-43.) C.C. then moved in March 2017 to unit "3E," which was located above and diagonal to appellant's mother's apartment, and lived there either through the time of trial, since that was the address she provided the court, or less than six months prior to trial based on her later testimony that she had moved out of the building in June 2022. (Tr. Vol. III at 340-43.)

{¶ 19} C.C. testified she knew appellant through his parents. Appellant's mother was a babysitter for C.C.'s children for a long time and appellant's father, now deceased, would help her out around the house. The families would spend a lot of time together and got to know each other well. As to appellant, C.C. testified that she did not know him as well since she spent more time with his parents, and he did not live there the majority of the time she did. She specified that she did know appellant lived in his mother's apartment "at some point," that he did still live at that address in 2011, and that she did not know what year appellant moved out of the apartment. (Tr. Vol. III at 311.) According to C.C., appellant was "relatively a homebody" who kept to himself and was either at work or in his room. (Tr. Vol. III at 314.)

{¶ 20} C.C. described the noise levels in the apartments as "loud" and the walls on the apartments as "thin." (Tr. Vol. III at 309.) "You pretty much hear everything coming

and going, front door slams, people opening and closing their door. * * * [Y]ou can hear - - pretty much hear throughout that whole building." (Tr. Vol. III at 309.) C.C. stated that, from her 3E apartment, she could hear yelling from appellant's mother's apartment and the unit above appellant's mother's apartment could hear normal speaking voices. She also testified that from her apartment on the other side of the building she would have been able to hear screaming and loud noises from appellant's mother's apartment and, during the period in question, she did not hear anyone screaming for help or anything along those lines.

{¶ 21} C.V. was then called as a witness on behalf of appellant. C.V. testified he and appellant are best friends and had been for over 10 years. The two spend time together playing video games and watching movies. According to C.V., appellant lived with his mother at her apartment "[b]efore he turned 18" and then appellant, C.V., and another roommate lived together at an apartment on Greenfield Drive from 2013 to 2014. (Tr. Vol. III at 322.) During the time at the Greenfield Drive apartment, C.V. testified that he and appellant would spend most of their non-working hours together, mostly playing video games. He testified he never met someone named O.A. during that time.

{¶ 22} The defense called three witnesses: L.W.1, L.W.2, and C.H., who were minors at the time of trial, to testify as to their experiences in appellant's mother's apartment and interactions with appellant. L.W.1 testified she was born in 2005 and is appellant's niece. According to L.W.1, because her father was in jail and her mother "wasn't around," she began living with appellant's mother and father (her grandparents) beginning when she was 11 months old to when she was about 11 or 12 years old. (Tr. Vol. III at 348.) They shared the apartment with appellant and, although she had contact with him, they did not hang out since he mostly stayed in his room to play video games. She did not recall meeting anyone named O.A. but did remember her grandfather's brother (who is O.A.'s father) coming to the apartment "occasionally." (Tr. Vol. III at 365.) She also testified that she would occasionally leave the apartment to stay with other family or visit her father in jail.

{¶ 23} L.W.1 testified she moved in with her father when she was around 11 or 12 years old and stayed with him for around one and one-half years before moving in with appellant and his girlfriend when she was a freshman in high school around 2018 or 2019.

L.W.1 then moved back in with appellant's mother in the middle of her sophomore year of high school.

{¶ 24} The second minor, L.W.2, testified she was approximately the same age as her cousin L.W.1 and is also appellant's niece. According to L.W.2, she had known appellant since she was a baby and appellant watched her and L.W.1., "all the time" in appellant's mother's apartment. (Tr. Vol. III at 372.) L.W.2 explained, "[m]y mom would have to work and she would drop me off at the apartment and [appellant] would be - - he would watch us when I would get there. It was probably early in the morning and he would just watch me, and my cousin would be asleep. And he would just watch us and would take * * * [m]aking sure we are safe and, you know, feeding us, taking care of us. He might play with us" but "he might just check on us, * * * you know, he would just play his video games because as we were younger, he was just in his teens." (Tr. Vol. III at 372-73.) According to L.W.2, appellant had watched her in this way "[f]rom the time I was, like, about six months old till, like, 15, still sometimes now, but not as much." (Tr. Vol. III at 375.) L.W.2. confirmed that during this period, she would spend time with L.W.1 at appellant's mother's apartment. L.W.2 agreed she was "specifically babysat by [appellant], not by his mother." (Tr. Vol. III at 379.)

{¶ 25} L.W.2 testified that, mostly, it was just her and L.W.1 there at the apartment with appellant, but other children—all boys—would at times be there too. According to L.W.2 she did not know anything about O.A., had never met O.A. or heard her name, and had never seen her at the apartment. She confirmed that during 2013 she was 8 years old, and nothing ever happened to her during the relevant period that she considered frightening or inappropriate. She agreed she was not at the apartment every day and that sometimes in the summer she would be at home with her mother.

{¶ 26} The third minor, C.H., testified to being approximately the same age as L.W.1 and L.W.2, and she lived in the same apartment building as appellant from the age of "under one" to "around 12." (Tr. Vol. III at 386.) Although her apartment was on the same floor as appellant's mother's apartment, C.H. could not hear anything going on in the apartment. According to C.H., "he babysat" her and L.W.1 "about three or four days a week maybe." (Tr. Vol. III at 391.) C.H. later testified it was appellant's parents who watched them while appellant was isolated in his room and specified it was "mostly" appellant's

mother who babysat them. She would see appellant in the hall and in the living room, but he generally played video games. In addition to L.W.1, C.H. remembered seeing L.W.2, but she testified she was not familiar with O.A. "I have no idea who that is." (Tr. Vol. III at 396.)

{¶ 27} Appellant's mother (O.A.'s aunt), was the next witness to take the stand on behalf of the defense. Appellant's mother testified that she still lives in the same apartment and her husband died in 2020. According to appellant's mother, appellant lived with her "up until 2013." (Tr. Vol. III at 404.) She testified she knows O.A. and had seen O.A. at her apartment "[p]robably in 2009" when O.A. was about three years old and stayed at the apartment for one night. (Tr. Vol. III at 406.) To her knowledge, O.A. had not been in her apartment since then, and she has not seen O.A. at family functions. Appellant's mother testified that she does talk to O.A.'s father on the phone and sees him at family functions. O.A.'s father would visit her apartment frequently, "maybe around [the] holidays." (Tr. Vol. III at 415.)

{¶ 28} Appellant's mother testified that she babysits a lot and has 4 to 5 kids in her house in a typical day. She raised L.W.1 since she was 11 months old and testified there has never been a time when L.W.1 has not lived with her. She later testified L.W.1 did live with her father at some point, but she still had custody and L.W.1 returned in 2020. She also watched L.W.2, C.H., and all 4 of C.C.'s kids at her apartment. To the best of her knowledge, appellant was not alone with C.H., L.W.1, or L.W.2 in her apartment.

{¶ 29} A.A., grandmother to both O.A. and appellant testified that she knows O.A. and has a good relationship with her. According to A.A., she was able to see O.A. until O.A. was about 3 or 4 years old when her mother moved to another Ohio town. She testified O.A.'s father (her son), had lived with her recently but did not live with her in 2012.

{¶ 30} Appellant then testified as the final witness for the defense. According to appellant, he was born in 1993 and lived in his mother's apartment until the beginning of 2013, at which time he moved out and into an apartment on Greenfield Drive with a friend and, part of the time, C.V. Appellant testified he lived in the Greenfield apartment for six years, from 2013 to 2019.

{¶ 31} Defense counsel attempted to introduce a letter pertaining to appellant's residential history, which spurred an objection by the prosecution. Counsel for both parties discussed the letter during a sidebar with the judge, during which the prosecution stated

the letter appeared to be a "gas paper" and, "[i]t looks like there was confirmation that he had gas at this address * * * from 2015 to 2017." (Tr. Vol. III at 435.) As to grounds for the objection, the prosecution claimed the gas letter was not provided in discovery and asserted defense counsel never filed a notice of alibi. Defense counsel replied "[i]t may be a minor problem," but appellant had already testified about where he was living and the gas letter was important to show he was living elsewhere at the time of the incidents. (Tr. Vol. III at 435.) The trial court determined the defense could not present evidence of alibi since they did not provide prior notice and agreed with the prosecution's suggestion that the defense "move on a different direction of questioning since he established there is a different address." (Tr. Vol. III at 436.)

{¶ 32} Shifting back to the time appellant lived with his mother, appellant agreed he had contact with a lot of younger girls, including L.W.1, L.W.2, and C.H., since his mother was their babysitter. Appellant testified he mostly saw the girls in passing and did not allow anyone in his room. When asked if he would also babysit the girls, appellant responded:

> Depends how you define babysitting. Like, if she had to run to the store or something, she would open my door and say, hey, I am running to the store, kids are out there, and I would just acknowledge, okay. And 90 percent of the time, I never even knew when she came back because I was too into my video game.
>
> * * *
>
> If they got hungry or something, they would come and ask me to make them something to eat, get them something to drink, but most of the time they really didn't bother me.

(Tr. Vol. III at 431-32.)

{¶ 33} Appellant acknowledged knowing O.A. and remembered "seeing her for the first time when she was one year old" and O.A. and her parents living close to their grandmother. (Tr. Vol. III at 433.) Appellant testified that, since seeing O.A. as a baby in her parent's home, he has seen O.A. "[n]ot often at all" and possibly could have seen her at family gatherings. (Tr. Vol. III at 437.)

{¶ 34} On cross-examination, appellant testified that during summer 2013, he would have been 19 going on 20 years old. He agreed that he would stay back in the apartment if his brothers or sisters would go to the park and disagreed with L.W.2's

testimony that appellant babysat the younger girls. Appellant did not recall a night when O.A. stayed with them when she was 3 years old and testified he would see O.A.'s father "sometimes * * * [b]ut not very often." (Tr. Vol. III at 442.) Appellant reiterated that he had only seen O.A. when she was 1 year old at her parent's house and, when asked how it is possible O.A. knew where his bedroom was he replied "[m]ost people knew where my bedroom is. * * * They know I never came out of it so most people knew the door was closed 90 percent of the time, that was my room. * * * I wouldn't know if she was in the house or not. Like I said, I didn't come out very much. I played video games 90 percent of the time." (Tr. Vol. III at 444.)

{¶ 35} On re-direct examination, appellant testified that, to the best of his knowledge, O.A. was never in his bedroom. Appellant denied O.A. screamed in his bedroom and denied raping O.A. over a four-year period. He testified that, to the best of his knowledge, other people would be in the apartment that could have, due to the acoustics, heard what was going on in the apartment. Appellant, when asked by defense counsel, denied that he paid anyone to come to court to lie for him.

{¶ 36} The defense rested its case, and the matter proceeded to closing arguments. During closing arguments, the prosecution emphasized various contradictions between the testimonies of the three girls, appellant's mother, and appellant, and remarked "how do we believe them at all? How do we believe they never saw [O.A.] in that apartment? It is all a contradiction. It is a lie." (Tr. Vol. IV at 462.) Defense counsel's argument centered on the lack of a quality investigation by police, which forced defense counsel to find witnesses, and whether O.A. essentially "gave up" trying to tell people the truth and submitted to the persistence of her mother and the caseworker in pursuing an untrue, "cooked up" narrative that appellant raped her. (Tr. Vol. IV at 473-74.) In its rebuttal argument, the prosecution responded by stating, "defense counsel said that he had to go out and hunt down these witnesses to complete the investigation. An investigation is not bringing in witnesses who are going to make up a story or lie about [O.A.] being there. That is just bringing in witnesses to bolster something that is untrue." (Tr. Vol. IV at 485.) The jury was instructed that the evidence does not include the indictment or the opening or closing arguments of counsel, that jury members are the sole judges of the facts, the credibility of the witnesses, and the weight of the evidence, and that it is the jury's "province to determine what

testimony is worthy of belief." (Tr. Vol. IV at 491-93; Dec. 8, 2022 Jury Instructions at 2-4.)

{¶ 37} Following deliberation, the jury found appellant guilty of rape in Count 2 for engaging in sexual conduct, digital penetration, with O.A. on or about May to September 2013 when she was less than 13 years old, with an additional finding that O.A. was not under the age of 10 years old at the time of the offense, and guilty of rape in Count 4 for engaging in sexual conduct, fellatio, with O.A. on or about May to September 2015 when she was less than 13 years old. The jury further found appellant not guilty of rape in Count 3, which involved sexual conduct on or about May to September 2014. Following a hearing, the trial court sentenced appellant to an indefinite sentence of 10 years to life on each count, served consecutively, for a total of 20 years to life in prison, and notified appellant of lifetime sexual offender registration duties.

## II. ASSIGNMENTS OF ERROR

{¶ 38} Appellant timely appeals and assigns the following five assignments of errors for our review:

> [I.] A criminal defendant is deprived of his right to effective assistance of counsel when his counsel's performance at trial is objectively unreasonable by failing to disclose to the State his intention to claim alibi in violation of the Sixth and Fourteenth Amendments of the United States Constitution; Article I, Sections 10 and 16 of the Ohio Constitution.
>
> [II.] The trial court erred when it denied [appellant's] Rule 29 Motion for Acquittal.
>
> [III.] The verdicts of guilt as to all counts were against the manifest weight of the evidence.
>
> [IV.] The trial court erred when it, over objection, failed to strike or otherwise instruct the jury to disregard certain statements made by the prosecution during closing.
>
> [V.] A sentence may not be sustained where the cumulative errors that occurred in the trial deprived the [appellant] of a fair trial.

## III.  LEGAL ANALYSIS

{¶ 39}  In this appeal, appellant asserts his trial counsel was ineffective concerning the failure to disclose an intention to claim alibi, the trial court improperly denied his Crim.R. 29 motion for acquittal and failed to strike a statement by the prosecutor during closing argument, his convictions are against the manifest weight of the evidence, and cumulative error.  Having considered appellant's assigned errors, we find each to lack merit for the reasons described below.

### A. Ineffective assistance of counsel

{¶ 40}  In his first assignment of error, appellant asserts he was deprived of his right to effective assistance of counsel.  To prevail on a claim of ineffective assistance of counsel, appellant must satisfy a two-prong test; his failure to satisfy either part of the test is fatal to the claim.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989).

{¶ 41}  First, appellant must demonstrate that his counsel's performance was deficient.  *State v. Nicholson*, ___ Ohio St.3d ___, 2024-Ohio-604, ¶ 318; *Strickland* at 687.  This first prong requires appellant to show "that counsel's performance fell below an objective standard of reasonable representation." *Nicholson* at ¶ 318.  Courts review claims of ineffective assistance of counsel with a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *State v. Abdullahi*, 10th Dist. No. 21AP-350, 2024-Ohio-418, ¶ 41, citing *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101.

{¶ 42}  Second, appellant must establish that he was prejudiced by the deficient performance.  *Nicholson* at ¶ 318; *Strickland* at 687.  The second prong requires appellant to show that "there is a reasonable probability that but for counsel's errors, the proceeding's result would have been different." *Nicholson* at ¶ 318.  A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial.  *Id.*, citing *Strickland* at 694.

{¶ 43}  In his assignment of error, appellant contends his counsel's performance at trial was objectively unreasonable by failing to disclose to the state his intention to claim alibi in violation of Crim.R. 12.1.  He distinguishes *State v. Smith*, 17 Ohio St.3d 98 (1985), which determined a trial court did not abuse its discretion in precluding a defendant or other alibi witnesses from testifying under certain circumstances.  He argues that "[a]

reasonably prudent lawyer would have known that they were required to submit a notice of alibi 30 days before trial." (Appellant's Brief at 9.) Moreover, appellant asserts this conduct was prejudicial because "the jury was not able to hear [appellant] testify to his residence beyond stating that he lived somewhere else." (Appellant's Brief at 9.)

{¶ 44} Crim.R. 12.1 states:

> Whenever a defendant in a criminal case proposes to offer testimony to establish an alibi on his behalf, the defendant shall, not less than thirty days before trial in a felony case and fourteen days before trial in a misdemeanor case, file and serve upon the prosecuting attorney a notice in writing of the defendant's intention to claim alibi. The notice shall include specific information as to the place at which the defendant claims to have been at the time of the alleged offense. If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant for the purpose of proving such alibi, unless the court determines that in the interest of justice such evidence should be admitted.

{¶ 45} In this case, defense counsel filed a notice a notice of alibi on May 4, 2022, which would fall more than 30 days prior to the December 2022 trial. In this notice, which appears in the appellate record, appellant through counsel asserted he intended to establish that he did not live at the location where the offenses were alleged to have occurred and claimed that he had been "living at a different address for what may be a significant portion of this period, and [was] attempting to obtain rental and utility records to prove this." (May 4, 2022 Notice at 1-2.) Considering appellant's counsel did file a notice of alibi, one that references the attempt to procure evidence appellant lived at another address, the assignment of error and arguments made by appellant are factually against the record.

{¶ 46} Moreover, appellant has not established the inability to admit and reference the gas letter prejudiced him. Appellant and other witnesses called by the defense were not precluded from testifying regarding appellant's residence during the years in question. The gas letter's usefulness in corroborating this testimony is limited since, as gleaned from the sidebar discussion at trial, it appears to have only concerned dates from sometime in 2015 onward, which does not necessarily cover the dates in question. (*See* Tr. Vol. III at 435) ("It looks like there was confirmation that he had gas at this address * * * from 2015 to 2017."). Significantly, the gas letter itself does not appear in the appellate record, which precludes us from evaluating how its exclusion impacted appellant's case. *See State v. Plymale*, 4th

Dist. No. 15CA1, 2016-Ohio-3340, ¶ 39 (stating the appellant could not prevail in a direct appeal on a claim of ineffective assistance of counsel premised on his trial counsel's failure to file a notice of alibi where his argument was "based on evidence that is outside the record"); *In re T.T.*, 6th Dist. No. OT-15-037, 2016-Ohio-5075, ¶ 12 (determining ineffective assistance of counsel claim failed, even where it was undisputed appellant's trial counsel failed to file a notice of appeal, where the appellant could "only speculate that such [alibi] testimony would have aided him at trial").

{¶ 47} Finally, even if the gas bill covered dates in question, having gas at another address does not establish appellant was never at his mother's residence during the pertinent timeframe. *See State v. Nicholson*, 8th Dist. No. 85977, 2006-Ohio-1569, ¶ 59 (explaining that where testimony did not provide the defendant with an alibi, the defendant did not suffer any prejudice even if the notice of alibi was filed late). As a result, appellant has not established either prong of the test for ineffective assistance of counsel.

{¶ 48} Appellant's first assignment of error is overruled.

**B. Crim.R. 29 motion for acquittal**

{¶ 49} Appellant's second assignment of error challenges the trial court's denial of his Crim.R. 29 motion for acquittal. Crim.R. 29(A) provides that the court, "on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." "Review of the denial of a Crim.R. 29 motion and the sufficiency of the evidence apply the same standard." *Abdullahi*, 2024-Ohio-418, at ¶ 22, citing *State v. Fugate*, 10th Dist. No. 12AP-194, 2013-Ohio-79, ¶ 5.

{¶ 50} "[W]hether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial." *State v. Harris*, 10th Dist. No. 21AP-678, 2023-Ohio-3994, ¶ 14, citing *State v. Smith*, 10th Dist. No. 03AP-1157, 2004-Ohio-4786, ¶ 16; *State v. Frazier*, 10th Dist. No. 05AP-1323, 2007-Ohio-11, ¶ 7; *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Jordan*, ___ Ohio St.3d ___, 2023-Ohio-3800, ¶ 16; *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus,

*superseded by state constitutional amendment on other grounds* as stated in *State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4.

**{¶ 51}** "[A]n appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' " *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, ¶ 19, quoting *Jenks* at paragraph two of the syllabus. "A verdict should not be disturbed on appeal unless reasonable minds could not reach the trier of fact's conclusion." *Jordan* at ¶ 16, citing *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, ¶ 74. Whether there is legally sufficient evidence to sustain a verdict is a question of law. *Thompkins* at 386.

**{¶ 52}** In support of the assignment of error, appellant argues the trial court should have granted his Crim.R. 29 motion because the only evidence to support each charge was the victim's testimony recounting events allegedly occurring nearly ten years prior to trial, there was no physical evidence, such as fingerprints or DNA, to support the charges, and no corroborating witnesses. Having reviewed the record, we agree with the trial court that the state presented sufficient evidence related to the rape charges to overcome appellant's Crim.R. 29 motion for acquittal.

**{¶ 53}** Appellant was convicted of two counts of rape, pursuant to R.C. 2907.02, of a person less than 13 years of age. In pertinent part, R.C. 2907.02(A)(1)(b) states:

> No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies:
>
> * * *
>
> The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

The definition of "[s]exual conduct" includes fellatio and, "without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another." R.C. 2907.01(A).

**{¶ 54}** In this case, O.A. testified in pertinent part that while she was visiting her father during her 2013 summer break, during which time she was nine years old and turned ten, she was left in her aunt's apartment while her father worked. After other people left

the apartment, O.A. testified that appellant would engage her in a "game" where he would hit her and see how loud she could scream. (Tr. Vol. II at 107-09.) According to O.A., the game escalated to being more aggressive and, after she turned ten that summer, it turned sexual. O.A. testified that during the first sexual incident in 2013, appellant put his fingers "in my private areas. * * * My vagina." (Tr. Vol. II at 110.) During that summer, "[i]t happened so many times * * * I lost track." (Tr. Vol. II at 111.) O.A. further testified that appellant did not stop sexually assaulting her until summer 2015 when she fought back. Specifically, O.A.'s testimony and Yasho's account of her interview with O.A., along with evidence that during this last occurrence appellant put his penis in O.A.'s mouth and O.A. bit his penis.

{¶ 55} Contrary to appellant's position, "[u]nder Ohio law, 'a rape victim's testimony alone, if believed, is enough evidence for a conviction.' " *State v. D.E.M.*, 10th Dist. No. 15AP-589, 2016-Ohio-5638, ¶ 111, quoting *State v. Fortson*, 8th Dist. No. 92337, 2010-Ohio-2337, ¶ 47. *See also State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, ¶ 177, citing *State v. Dawson*, 5th Dist. No. 2008-CA-122, 2009-Ohio-2331, ¶ 33 ("the testimony of one witness, although it may be contradicted by another, is sufficient to support the finding if the trier of fact finds said witness more credible"). In the same vein, corroborating physical evidence is not required to secure a rape conviction.[1] *State v. Johnston*, 12th Dist. No. CA2021-09-085, 2022-Ohio-2097, ¶ 24 ("Ohio courts have consistently held that physical evidence is not required to support a conviction for a sex offense, and the lack of physical evidence does not mean the offense did not occur as testified to by a victim."). *See also State v. Rigsbee*, 10th Dist. No. 22AP-370, 2023-Ohio-1494, ¶ 27 ("The absence of corroborating physical evidence does not negate the testimony of a witness to a crime.").

{¶ 56} On this record, we agree with the trial court that the evidence presented, when viewed in a light most favorable to the prosecution, would allow a rational trier of fact to find the essential elements of rape proven beyond a reasonable doubt. *Jordan* at ¶ 16. Accordingly, the trial court did not err in denying appellant's Crim.R. 29 motion for acquittal.

{¶ 57} Appellant's second assignment of error is overruled.

---

[1] *Compare* R.C. 2907.06(B) (providing that "[n]o person shall be convicted of [the crime of sexual imposition] solely upon the victim's testimony unsupported by other evidence") with R.C. 2906.02 (providing requirements to support a rape conviction without requirement to corroborate victim's testimony).

**C. Manifest weight of the evidence**

{¶ 58} With his third assignment of error, appellant contends the jury's guilty verdicts were against the manifest weight of the evidence. "Challenges to the sufficiency of the evidence and the weight of the evidence involve distinct legal concepts and different standards of review." *Jordan* at ¶ 15, citing *Thompkins* at paragraph two of the syllabus. "A verdict can be against the manifest weight of the evidence even though legally sufficient evidence supports it." *Nicholson*, 2024-Ohio-604, at ¶ 70. In contrast to a sufficiency challenge, a manifest weight claim "attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion." *Harris* at ¶ 15, citing *State v. Richey*, 10th Dist. No. 17AP-260, 2018-Ohio-3498, ¶ 50, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11-13, citing *Thompkins* at 386-87. In reviewing whether a judgment is against the manifest weight of the evidence, an appellate court "looks at the entire record and ' "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered." ' " *Jordan* at ¶ 17, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 59} "Although an appellate court reviews credibility when assessing the manifest weight of the evidence, the court must be mindful that determinations regarding witness testimony and the weight of testimony are primarily for the trier of fact." *State v. Jamii*, 10th Dist. No. 21AP-330, 2023-Ohio-4671, ¶ 47, citing *Harris* at ¶ 17, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The trier of fact was able " 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Harris* at ¶ 17, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). A conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of the events over the appellant's. *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19.

{¶ 60} Overall, "[a] manifest-weight challenge should be sustained ' "only in the exceptional case in which the evidence weighs heavily against the conviction." ' " *Nicholson*, 2024-Ohio-604, at ¶ 71, quoting *Thompkins* at 387, quoting *Martin* at 175.

Further, reversal of a jury verdict on manifest weight grounds requires unanimous concurrence of all three judges on the court of appeals panel reviewing the case. *Harris* at ¶ 18, citing Article IV, Section 3(B)(3) of the Ohio Constitution; *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

{¶ 61} Appellant contends that "[t]he only physical and testimonial evidence presented at trial was [O.A.'s] testimony" and the case lacked evidence such as fingerprints, DNA evidence, and corroborating witnesses. (Appellant's Brief at 16.) Appellant further argues O.A.'s testimony lacked specificity as to when the assaults occurred: "Her testimony described events which occurred during a large time frame but could not point to any particular date." (Appellant's Brief at 16-17.)  As a result, appellant asserts there is "reasonable doubt" in this case.  (Appellant's Brief at 17.)

{¶ 62} Having reviewed the record, we disagree. As provided in the second assignment of error, appellant was convicted of two counts of rape, pursuant to R.C. 2907.02(A)(1)(b), for engaging in sexual conduct with a person less than 13 years of age. "Sexual conduct" includes "fellatio" and, "without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another."  R.C. 2907.01(A).

{¶ 63} In this case, the credibility of O.A's contention that appellant raped her over multiple years was strengthened by her consistent and detailed accounts of appellant's conduct, the testimonies of Yasho and her mother which were consistent with O.A.'s testimony, and even, at times, the recollection of some of the defense witnesses.  O.A. described to her mother, to Yasho, and to the jury a generally consistent account of escalating conduct by appellant during holiday and summer breaks when she visited her father and was babysat at her aunt's apartment—appellant started with a "game," which advanced to more aggressive physical actions, and then proceeded to sexual conduct.  He only stopped when O.A, as an 11- or 12-year-old, fought back in 2015.  O.A. was able to describe her aunt's apartment in detail, including the uses of each room, the proximity of the rooms to each other, and details of the rooms where the sexual conduct took place.

{¶ 64} Consistent with O.A.'s account, O.A.'s mother testified that, in 2015, O.A. no longer wanted to come to Columbus. O.A.'s mother became concerned with changes in

O.A.'s behavior and appearance, prompting her to attempt to get O.A. to talk about what was going on with her. When O.A. disclosed the assaults, her mother took immediate action in contacting police, children services, and in attempting to get O.A. other help. Yasho's testimony describing O.A.'s disclosure was consistent with O.A.'s testimony and, in Yasho's opinion, O.A.'s disclosure was detailed. Also consistent with O.A.'s description of her experience, the three minor children (L.W.1, L.W.2, and C.H.) called by the defense testified that they did go to appellant's mother's apartment for babysitting and that appellant, at minimum, was present. L.W.2 testified that appellant—not his mother—actually babysat them, and appellant himself admitted to being left in charge of the younger girls in his mother's absence.

{¶ 65} Moreover, the jury could have reasonably found that appellant and the defense witnesses' testimony concerning O.A. lacked credibility. *See Jamii* at ¶ 47 ("The trier of fact is free to believe or disbelieve all or any of the testimony provided at trial."). Even though appellant testified O.A. had not been in his mother's apartment or in his room, and his mother testified O.A. had been in the apartment when she was about three years old, appellant could not explain how O.A. knew detailed information about her aunt's apartment or his room there. L.W.1 denied not just that she had never seen O.A.—a family member akin to a cousin around her same age—in O.A.'s aunt's apartment but denied even knowing O.A. existed. This stood in contrast to the testimony of appellant, his mother (who raised L.W.1), and his grandmother, who all described knowing O.A. since she was a baby.

{¶ 66} Furthermore, while appellant and his mother contended appellant moved out in 2013, there was evidence presented that he continued to babysit at his mother's apartment, whether he lived there or not. According to L.W.2, appellant had watched her until she was 15 years old—around 2020—and confirmed that during this period, she would spend time at appellant's mother's apartment. C.C.'s testimony was undermined by the lack of clarity as to when she lived in the apartment above and diagonal to appellant's mother's apartment, and her insistence that she still could have heard screams from appellant's mother's apartment when she lived on the other side of the apartment building. As to the acoustics of the building, many witnesses, including O.A., acknowledged that the apartment building was very loud and neighbors could hear each other, to the point of police having to respond to noise complaints at the building. But that fact cuts both ways—

the jury could reasonably conclude that a perpetually loud building could mask or normalize the screams of a child.

{¶ 67} Lastly, appellant does not provide any legal authority in support of his general contention that O.A. "could not point to any particular date" the sexual conduct occurred. (Appellant's Brief at 17.) As such, he has not demonstrated error. *See State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 34 ("[a]n appellant must support their assignments of error with an argument, which includes citation to legal authority"), citing App.R. 16(A)(7) and 12(A)(2); *J.W. v. D.W.*, 10th Dist. No. 19AP-52, 2019-Ohio-4018, ¶ 55 (noting that it is not the duty of an appellate court to create a legal argument on an appellant's behalf).

{¶ 68} Nevertheless, appellant's point in this regard lacks merit. Generally, "[i]n cases alleging sexual misconduct involving a child, the state need not prove the offense occurred on an exact date." *State v. T.E.H.*, 10th Dist. No. 16AP-384, 2017-Ohio-4140, ¶ 61. *See also State v. Reinhardt*, 10th Dist. No. 04AP-116, 2004-Ohio-6443, ¶ 20 (noting, "[t]he precise date and time a rape occurs is not an essential element of the crime"). Furthermore, Yasho testified that in her experience, it is not uncommon for a victim to be unable to recall particular dates when the victim was abused as a child and years pass before they are interviewed.

{¶ 69} Our review of the testimony in this case shows that, at times, counsel for both parties stated incorrect dates and ages. However, viewed in its entirety, the record shows O.A. consistently testified that appellant put his fingers into her vagina while she was visiting her father during her 2013 summer break, after she turned ten years old. After the sexual incidents started, she started to "draw a blank" and "[i]t happened so many times * * * I lost track." (Tr. Vol. II at 110-11.) According to O.A., appellant did not stop sexually assaulting her until summer 2015 when she fought back. Through O.A.'s testimony and Yasho's account of her interview with O.A., the record shows that during this last occurrence in summer 2015, appellant put his penis in O.A.'s mouth and O.A. bit his penis. We note the jury, in finding appellant not guilty of rape for the 2014 summer time frame and not finding him guilty of rape of a minor under the age of ten, paid careful attention to the evidence of when the sexual conduct occurred in this case. Our own review of the record

likewise shows the testimony as to when the sexual conduct occurred supports the convictions.

**{¶ 70}** Overall, the trier of fact did not clearly lose its way and create such a manifest injustice that the conviction must be reversed and a new trial ordered. Rather, the manifest weight of the evidence supported appellant's convictions for rape with respect to both counts.

**{¶ 71}** Accordingly, appellant's third assignment of error is overruled.

### D. Prosecutorial misconduct in closing argument

**{¶ 72}** In his fourth assignment of error, appellant argues the trial court erred when it, over objection, failed to strike or otherwise instruct the jury to disregard certain statements made by the prosecution during closing argument. Appellant has not demonstrated the trial court erred in this regard.

**{¶ 73}** "Courts afford prosecutors wide latitude in closing arguments, and prosecutors may draw reasonable inferences from the evidence at trial, commenting on those inferences during closing arguments." *Abdullahi*, 2024-Ohio-418, at ¶ 28, citing *State v. Hunt*, 10th Dist. No. 12AP-1037, 2013-Ohio-5326, ¶ 18. "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Encarnacion*, 10th Dist. No. 16AP-817, 2017-Ohio-5530, ¶ 10, citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984).

**{¶ 74}** In assessing whether the prosecutor's comments were improper, an appellate court must review a closing argument in its entirety to determine whether prejudicial error occurred: "[a] prosecutor's isolated comments are not to be taken out of context and given their most damaging meaning." *Encarnacion* at ¶ 10, citing *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 94. If the remarks were improper, "prosecutorial misconduct is not grounds for reversal unless the defendant has been denied a fair trial." *Abdullahi* at ¶ 28, citing *State v. Maurer*, 15 Ohio St.3d 239, 266 (1984). *State v. Wilkerson*, 10th Dist. No. 01AP-1127, 2002-Ohio-5416, ¶ 38, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982) (" '[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.' ").

{¶ 75} Through this assignment of error, appellant asserts the prosecutor, in the rebuttal of the defense's closing argument, made the following improper statement:

> Additionally, defense counsel said that he had to go out and hunt down these witnesses to complete the investigation. An investigation is not bringing in witnesses who are going to make up a story or lie about [O.A.] being there. That is just bringing in witnesses to bolster something that is untrue.

(Tr. Vol. IV at 485.) According to appellant, "the problem lies [in] the suggestion to the jury that the only reason why they testified was to support the defendant's contention that he did not rape O.A. and suggests that they were lying." (Appellant's Brief at 19.) Appellant argued the trial court was "unreasonable" in overruling appellant's objection and the error justifies reversal. (Appellant's Brief at 19.)

{¶ 76} For the following reasons, appellant has not met his burden in demonstrating the trial court erred in this case. As provided above, a prosecutor is given considerable latitude in closing arguments. *Encarnacion* at ¶ 9. While a prosecutor may not express his or her personal belief or opinion as to the credibility of a witness, the prosecutor may comment on the evidence presented at trial and reasonable inferences drawn from the evidence. *Id.* In line with this general rule, this court has determined a defense counsel's suggestion in closing arguments that the victim was not to be believed and that the defendant's version of events was more credible was not improper where the comment could be inferred from the testimony at trial and the case hinged on the credibility of the witnesses. *Abdullahi* at ¶ 35-36. *See also State v. Young*, 10th Dist. No. 18AP-630, 2020-Ohio-462, ¶ 50 (finding no plain error from prosecutor's comments that the witness "didn't lie" and "[was] believable" because the defense argued, at least in part, that the case hinged on the witness's credibility and the comments could be linked to the evidence presented); *Smith*, 14 Ohio St.3d at 13 (determining prosecutor's reference to defense evidence as "lies," "garbage," "garbage lies," "[a] smoke screen," and "a well conceived and well rehearsed lie" to be improper where the statements were not based on evidence presented at trial).

{¶ 77} Here, our review of the closing arguments, as a whole, shows the prosecutor's statement regarding the witnesses was based on his interpretation of the evidence showing multiple contradictions in the witnesses' testimony, rather than a statement of his personal opinion. (*See* Tr. Vol. IV at 460-63) (discussing, in the prosecution's principal closing

argument, that the defense witnesses contradicted each other regarding appellant babysitting the girls and what girls were present in the apartment). This case, like *Abdullahi*, hinged on the credibility of the witnesses and we note the defense attorney in closing similarly suggested O.A. was lying.[2] Moreover, appellant has not shown that even if the statement was improper, it denied him a fair trial. The jury was told repeatedly that closing arguments are not evidence and that they were the sole judges of the facts and credibility of the witnesses. (*See* Tr. Vol. IV at 455, 456) ("As the Court instructed you, closing arguments * * * are not evidence. The evidence is what you heard over the past few days of testimony presented and * ** exhibits."); (Tr. Vol. IV at 491; Dec. 8, 2022 Jury Instructions at 2) ("The evidence does not include the indictment or the opening statements or closing arguments of counsel. The opening statements and closing arguments are designed to assist you. They are not evidence."); (Tr. Vol. IV at 492; Dec. 8, 2022 Jury Instructions at 3) ("You are the sole judges of the facts, the credibility of the witnesses, and the weight of the evidence."); (Tr. Vol. IV at 493; Dec. 8, 2022 Jury Instructions at 4) ("It is your province to determine what testimony is worthy of belief."). Where the trial court instructs the jury that closing arguments are not evidence, a reviewing court presumes the jury followed that instruction and that the verdict is not based on the content of the closing arguments. *Abdullahi* at ¶ 36, citing *State v. Nichols*, 10th Dist. No. 19AP-113, 2020-Ohio-4362, ¶ 28, citing *State v. Fudge*, 10th Dist. No. 16AP-821, 2018-Ohio-601, ¶ 52. *Noling* at ¶ 95 (concluding that no prejudicial error warranting reversal occurred based on potential improprieties in the prosecutor's argument where the court instructed the jury that counsel's arguments were not evidence).

{¶ 78} Considering all the above and noting that appellant failed to provide any legal support for his argument, we conclude appellant has not met his burden to demonstrate the trial court erred when it, over objection, failed to strike or otherwise instruct the jury to disregard the statement at issue made by the prosecution during closing arguments. App.R. 16(A)(7) and 12(A)(2). As a result, appellant's assignment of error lacks merit.

{¶ 79} According, appellant's fourth assignment of error is overruled.

---

[2] Defense counsel suggested O.A., after being pressured by her mother and Yasho, "gives up" on telling the truth and starts saying what the adults "want to hear." (Tr. Vol. IV at 473.)

### E. Cumulative error

**{¶ 80}** Appellant argues that cumulative errors and omissions in his case violated his constitutional rights. Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 223.

**{¶ 81}** In order to consider whether cumulative error is present, we must first find that multiple errors occurred in the case. *State v. Blanton*, 171 Ohio St.3d 19, 2022-Ohio-3985, ¶ 80; *State v. Shine-Johnson*, 10th Dist. No. 17AP-194, 2018-Ohio-3347, ¶ 109. As determined above, appellant's claims of error lack merit and, therefore, he " 'cannot establish a right to relief simply by joining those claims together.' " *Nicholson*, 2024-Ohio-604, at ¶ 343, quoting *Dean* at ¶ 296.

**{¶ 82}** Appellant's fifth assignment of error is overruled.

## IV. CONCLUSION

**{¶ 83}** Having overruled appellant's five assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and JAMISON, JJ., concur.

————————————