[Cite as *State v. Lammkin*, 2019-Ohio-682.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 18AP-398 |
| | | (C.P.C. No. 16CR-4300) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Kalawn R. Lammkin, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on February 26, 2019

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie B. Swanson*, for appellee.

**On brief:** *Wolfe Law Group, LLC,* and *Stephen T. Wolfe*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Kalawn R. Lammkin, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of aggravated murder and multiple other offenses. For the reasons that follow, we affirm.

I. Facts and Procedural History

{¶ 2} In August 2016, plaintiff-appellee, State of Ohio, indicted Lammkin on one count of aggravated burglary in violation of R.C. 2911.11, a first-degree felony; one count of aggravated murder in violation of R.C. 2903.01, an unspecified felony; one count of murder in violation of R.C. 2903.02, an unspecified felony; one count of kidnapping in violation of R.C. 2905.01, a first-degree felony; and one count of having a weapon while under disability in violation of R.C. 2923.13, a third-degree felony. The aggravated burglary, aggravated

murder, murder, and kidnapping counts each contained firearm and repeat violent offender specifications. Lammkin pleaded not guilty, and the matter was tried to a jury in April and May 2018. As pertinent to this appeal, the following evidence was adduced at trial.

{¶ 3} During the evening of August 2, 2016, Jamie Garrett was shot and killed in a house at 146 North Yale Avenue in Columbus, Ohio. The coroner determined Garrett's cause of death to be gunshot wounds of the trunk, and the manner of death was a homicide. According to the coroner's report, Garrett sustained a total of four gunshot wounds. He sustained a gunshot wound to his back, a gunshot wound to his right arm and chest, a superficial gunshot wound to his abdomen, and a graze gunshot wound to his right arm.

{¶ 4} Multiple witnesses testified regarding the circumstances of Garrett's shooting. Isaiah Hogan, who resided at the house on the day of the shooting, testified as follows. Lammkin had dated Hogan's sister, Latina Neal, and Neal had given birth to a son, K.L., during the time they dated. K.L. was one year old on the day of the shooting. Lammkin and Neal's relationship had ended prior to the day of the shooting. Hogan described the relationship as "toxic," but that they tried to be "cordial" for the benefit of K.L. (May 1, 2018 Tr. Vol. II at 114.) In June 2016, Lammkin and Neal were arguing when Hogan intervened, resulting in a physical fight between Lammkin and Hogan. After this altercation, Lammkin was not welcome at the house, and transfers of K.L. were to occur at public places. Several people lived at the house including Hogan, Neal, K.L., Hogan's sister D.W., two of Hogan's sisters' friends "Shy" and Adrianna Dawson, and Hogan's mother Cindy Henderson. All the residents of that property, except for Henderson, were present at the property at the time of Garrett's shooting.

{¶ 5} Hogan further testified that, at approximately 9:00 p.m. on the day of the shooting, he arrived home and was introduced to Garrett, who was eating and hanging out with the other residents of the house. Hogan was unaware of any scheduled meeting for Neal to transfer K.L. to Lammkin that evening. He was sitting on the couch when he heard a "loud banging on the [front] door." (Tr. Vol. II at 122.) Based on past experiences, Hogan "knew that it was Mr. Lammkin banging on the door." (Tr. Vol. II at 122.) Hogan knew the front door was locked because he had locked it upon returning from work, but he did not know whether the back door was also locked at that time. The back door would have been

accessible to someone who walked around the house.  Hogan called 911 and told the operator that Lammkin was at the door.  Hogan's call to 911 was played at trial, and the following exchange can be heard on the 911 recording:

> Defendant Lammkin:  What's up with you?
>
> Jamie Garrett:  I don't even know you.
>
> Isaiah Hogan:  What the fuck (unintelligible).
>
> Unidentified Speaker:  Oh, my God.
>
> Unidentified Speaker:  (Unintelligible) words.
>
> Defendant Lammkin:  UTG shit.  UTG shit.  UTG shit.  I don't know what the fuck you all want.
>
> Isaiah Hogan:  Just please don't hit her.  Please, I'm begging you, sir.  Please don't hit her.  Please don't hit her, dude, please, please.
>
> Defendant Lammkin:  Man, this is (unintelligible).
>
> Isaiah Hogan: Please don't hit her.  Please don't hit her.  Please, I'm begging you.  Please don't hit her.
>
> Defendant Lammkin:  I don't play around with my fucking son.  You couldn't even come and get the door? (Unintelligible).  You going to play the fuck out of me?  Now you're going to see how much I play.
>
> 911 Dispatcher:  Don't say anything.
>
> Isaiah Hogan:  Hello, Hello.
>
> 911 Dispatcher:  Don't say anything.  I got police on the way.  If he's still in there, don't say, don't talk if you can't.  Is he still in there?  You there?
>
> Isaiah Hogan:  Yes, I'm here.
>
> 911 Dispatcher:  Okay.  Is he male black, white or Hispanic?  The officers are on their way.

Isaiah Hogan: He's -- he's racially mixed. He's light skinned, he just came into this house, he just busted down this door, and he just shot at --

911 Dispatcher: Where is he at now? The police are on the way.

Unidentified speaker: Is he dead?

Isaiah Hogan: Oh, my God. Oh, my God.

911 Dispatcher: What's wrong?

Isaiah Hogan: Oh, my God. He just -- I'm on the police right now. He just shot this dude.

911 Dispatcher: He just shot somebody?

Isaiah Hogan: He just shot somebody.

911 Dispatcher: Where at?

Isaiah Hogan: In the house. He's on the floor.

(Tr. Vol. II at 131-33.) Hogan then informed the dispatcher that Lammkin had taken K.L., gotten into a vehicle, and left.

{¶ 6} At trial, Hogan explained that Lammkin had gotten inside the house and was angry. Hogan explained that after Lammkin said "What's up with you?", Garrett was "trying to just settle down the situation" by saying "I don't even know you." (Tr. Vol. II at 151.) Garrett had his hands in the air, with his palms facing upward. Garrett began to move his hands down slowly when Lammkin pushed him, pulled out a firearm and began to shoot. Garrett did not push or punch Lammkin. Lammkin repeatedly fired the weapon, and Garrett tried "to dodge the bullets" and exit the room. (Tr. Vol. II at 153.) Hogan explained that Lammkin's reference to "UTG" was to indicate his affiliation with the "gang" or "crew," and that saying it was like a "stamp" or "signature" when something "major" or "profound" was done. (Tr. Vol. II at 155.) After Lammkin finished shooting the firearm, he pointed the weapon toward the others. Then, after Lammkin said, "You're going to see how much I play," he "stormed out of the room." (Tr. Vol. II at 160.) A knife was later found at

the scene, but Hogan did not recognize it. Hogan did not see Garrett hold a knife before the shooting.

{¶ 7} Adrianna Dawson testified as follows. Dawson knew Garrett because she purchased marijuana from him, and she was planning to smoke marijuana with Garrett during the evening of August 2, 2016. That evening, Dawson and the others were hanging out at the house when they heard a loud banging on the front door. Dawson heard Lammkin say, "open the door, I don't know the fuck what you're doing in there," and "I know it's a nigger in there." (Tr. Vol. II at 257.) After he made those statements, it got silent. Then Dawson heard Garrett say "he's in the house." (Tr. Vol. II at 258.) Once Lammkin was in the bedroom, he slapped Garrett and then pulled out a weapon and fired multiple times. After shooting, Lammkin "was waving his gun around in" Dawson's face. (Tr. Vol. II at 263.) Immediately before the shooting, Garrett was scared and had no weapon in his hands. He was shaking and his voiced cracked when he said "I don't even know you" to Lammkin before he was shot. (Tr. Vol. II at 259.) Dawson never saw Garrett with the knife that was later found at the scene. She testified that the knife was a house or kitchen knife that they used to cut things, but that no one used it as a weapon against Lammkin. She did not know why the knife was found on the floor that night, but she acknowledged the house was kind of messy. Dawson denied opening the front door for Lammkin, and she was unaware of anyone else opening it for him. She testified that "UTG" stands for "Untamed Gorillas." (Tr. Vol. II at 264.)

{¶ 8} A few hours after the shooting, Columbus Police Officer Dennis Prestel arrested Lammkin at a property on Barnett Road in Columbus. At that time, Lammkin was drinking a beer "acting like nothing had happened." (May 2, 2018 Tr. Vol. III at 364.) Lammkin had no reported injuries.

{¶ 9} Lammkin testified on his own behalf. He acknowledged his felonious assault conviction in June 2016, and that he possessed a firearm on the night of the shooting even though that was unlawful due to his prior conviction. On the day of the shooting, Lammkin decided he wanted to see his son K.L., and he attempted to contact Neal to arrange for the child's transfer to him. He called Neal's phone, but it went to her voicemail. He then called Henderson, Neal's mother, to see if he could pick up K.L. Henderson said that would be fine. Because he had no vehicle, Lammkin got a ride from a "crack cocaine user" he knew

as "Big Boy." (Tr. Vol. III at 393.) As payment for the ride, Lammkin gave Big Boy crack cocaine. Lammkin possessed a firearm to protect himself from Hogan and Big Boy. When he arrived at the house, Lammkin could see Hogan in an upstairs window staring down at him. Lammkin knocked on the door a couple times, and then he knocked louder when no one answered. Dawson eventually came down the stairs and opened the door for him. They walked up the stairs and entered the bedroom with Hogan, Neal, and Garrett, whom he had never seen before.

{¶ 10} According to Lammkin's testimony, Garrett "all of a sudden out of nowhere, he just takes a swing at" him and hit him in the back of the head. (Tr. Vol. III at 398.) Lammkin pushed and punched at Garrett, who stumbled backward. Lammkin then pulled out his firearm to defend himself if needed. Garrett began to lift up his shirt and reach for what Lammkin believed was a weapon. Because Lammkin saw Garrett's hand coming up, he fired his weapon three or four times. After Lammkin fired the shots, he saw Garrett drop a knife. Lammkin explained that "UTG" stands for "Untamed Gorillas." (Tr. Vol. III at 409.) He did not view "Untamed Gorillas" as a gang, but he could "see how everyone would believe it's a gang." (Tr. Vol. III at 409.) He referenced that name immediately after shooting because he had defended himself well in the face of the attack. Lammkin grabbed his son K.L. and ran out of the house. On his way to the house on Barnett Road, Lammkin went to a corner store to buy some beer and cigarettes to calm his nerves. Lammkin admitted that he lied to the arresting officers when he denied being involved in the shooting and picking up his son.

{¶ 11} The parties stipulated that Lammkin had been convicted in June 2016 of committing felonious assault, a second-degree felony. In that case, Lammkin was sentenced to three years of intensive supervision community control, with a suspended prison sentence of eight years.

{¶ 12} Based on the evidence at trial, the jury found Lammkin guilty of committing aggravated burglary with a firearm specification, aggravated murder with a firearm specification, murder with a firearm specification, and having a weapon while under disability. The jury found Lammkin not guilty of committing kidnapping. The trial court found Lammkin guilty of the repeat violent offender specifications attached to the aggravated burglary, aggravated murder, and murder counts. The trial court merged the

aggravated murder and murder counts for the purpose of sentencing. For the offenses in this case, the trial court sentenced Lammkin to a total prison sentence of life without the possibility of parole for 36 years.

{¶ 13} Lammkin timely appeals.

## II. Assignment of Error

{¶ 14} Lammkin assigns the following error for our review:

> The jury's verdicts were against the manifest weight of the evidence.

## III. Discussion

{¶ 15} In this appeal, Lammkin argues the jury's verdicts finding him guilty of aggravated burglary, aggravated murder, and murder[1] were against the manifest weight of the evidence. We disagree.

{¶ 16} Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The jury, or the court in a bench trial, may take note of inconsistencies at trial and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). Consequently, "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982); *see State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, ¶ 20 ("a prerequisite for any reversal on manifest-weight grounds is conflicting evidence"). However, an appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving

---

[1] Because the murder count merged with the aggravated murder count at sentencing, we need not address Lammkin's manifest weight challenge to the murder count. *See State v. Worley*, 8th Dist. No. 103105, 2016-Ohio-2722, ¶ 23 (declining to address manifest weight argument for offenses that merged with aggravated murder offense, noting that a "conviction" consists of a guilty verdict and the imposition of a sentence or penalty); *see also State v. McKinney*, 10th Dist. No. 08AP-23, 2008-Ohio-6522. In view of the merger, and because Lammkin does not challenge his having a weapon while under disability conviction, we limit our analysis of his manifest weight challenge to his aggravated burglary and aggravated murder convictions.

conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 17} To prove the charge of aggravated burglary, the state was required to show that Lammkin, by force, stealth, or deception, trespassed in an occupied structure, when another person other than an accomplice was present, with purpose to commit any criminal offense therein, and he inflicted, attempted to inflict, or threatened physical harm, and/or had a deadly weapon on his person or under his control. R.C. 2911.11(A). To prove the charge of aggravated murder, the state was required to show that Lammkin purposefully caused the death of another while committing the offense of aggravated burglary and/or kidnapping. R.C. 2903.01(B).

{¶ 18} In challenging his aggravated murder conviction, Lammkin asserts the jury lost its way and created a manifest injustice by not finding that he shot Garrett in self-defense. To establish self-defense using deadly force, a defendant must prove by a preponderance of the evidence: (1) he was not at fault in creating the situation giving rise to the altercation; (2) he had a bona fide belief that he was in imminent danger of bodily harm and his only means of escape from such danger was the use of force; and (3) he did not violate any duty to retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002), citing *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. The elements of self-defense are cumulative. If a defendant fails to prove any one of the elements by a preponderance of the evidence, he fails to demonstrate that he acted in self-defense. *See State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, ¶ 73, citing *State v. Jackson*, 22 Ohio St.3d 281, 284 (1986).

{¶ 19} Lammkin's self-defense argument primarily relies on his own testimony at trial. According to his testimony, Garrett, without any provocation, attacked him and punched him in the back of his head. Lammkin testified that he shot Garrett after Garrett appeared to reach for a weapon. But the jury was free to disregard this testimony and

believe the testimony of other witnesses. Hogan and Dawson testified that Garrett did not have a weapon, that Garrett was simply trying to diffuse the situation, and that Lammkin was the aggressor. According to their testimony, Lammkin arrived at the house in an angry emotional state, banging on the door and yelling to be let inside. Somehow, he made his way inside the house and confronted the group. Hogan and Dawson testified that Lammkin shot Garrett even though he made no threatening movement toward Lammkin. Evidence also demonstrated that, after shooting Garrett, Lammkin pointed the weapon at the others and said "UTG shit. UTG shit. UTG shit." Hogan begged Lammkin not to hit one of his sisters, and Lammkin again expressed anger because no one had come to the door. Testimony further indicated that "UTG" was short for "Untamed Gorillas," which Lammkin at trial acknowledged could be viewed by some as a gang. Hogan testified that Lammkin's repeated reference to this group was essentially a "stamp" or "signature" in connection with the shooting. In view of the evidence at trial, we cannot find the jury lost its way and created a manifest injustice in rejecting Lammkin's self-defense claim and convicting him of aggravated murder.

{¶ 20} As to his aggravated burglary conviction, Lammkin argues that the jury lost its way and created a manifest injustice in finding that he trespassed on the property with intent to commit a criminal offense therein. "Trespass" is defined as knowingly and without privilege entering or remaining on the premises of another. R.C. 2911.21(A)(1). Lammkin testified that Henderson invited him over to pick up K.L., and that Dawson let him in the house when he arrived. Thus, according to his testimony, he did not trespass. However, the jury could have disbelieved his testimony regarding his conversation with Henderson. And even if Henderson had informed Lammkin that he could come over to the house to pick up K.L., that did not mean he was privileged to enter the structure once he arrived. Moreover, Dawson denied that she opened the front door for him, and Hogan provided supporting testimony that no one let Lammkin into the home. Lammkin also suggests that because there was no evidence of damage to the front door, someone had to have let him in. While Hogan was certain that the front door was locked before Lammkin arrived, he did not know if the back door was locked. He indicated that the back door would have been accessible to someone who walked around the house. Thus, while there was no direct evidence as to how Lammkin entered the house, and there was no visible damage to the

front door that would indicate a forced entry, the jury, in resolving this factual issue, could have reasoned that Lammkin quickly went around the side of the house and entered through the back door.

{¶ 21} Lammkin also argues the jury should have found he lacked the requisite criminal intent to support the aggravated burglary conviction. "For purposes of defining the offense of aggravated burglary pursuant to R.C. 2911.11, a defendant may form the purpose to commit a criminal offense at any point during the course of a trespass." *State v. Fontes*, 87 Ohio St.3d 527 (2000). "The crime of aggravated burglary continues so long as the defendant remains in the structure being burglarized because the trespass has not been completed." *State v. Powell*, 59 Ohio St.3d 62, 63 (1991). Lammkin argues his sole purpose for being at the property was to pick up his son. However, Dawson testified that, before entering the house, Lammkin was heard pounding on the door, saying "open the door, I don't know the fuck what you're doing in there," and "I know it's a nigger in there." This hostile language reasonably indicated his intent to physically injure someone inside, not simply to pick up his son. Furthermore, as discussed above in reference to Lammkin's aggravated murder conviction, the state's evidence demonstrated that Lammkin did not act in self-defense when he purposely shot and killed Garrett. Thus, even if Lammkin did not initially enter the house with the intent to commit a criminal offense, evidence supported a finding that he ultimately formed the requisite intent during the trespass, and this finding was not against the manifest weight of the evidence.

{¶ 22} Because Lammkin fails to demonstrate his aggravated burglary or aggravated murder convictions were against the manifest weight of the evidence, we overrule his sole assignment of error.

## IV. Disposition

{¶ 23} Having overruled Lammkin's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT, P.J., and DORRIAN, J., concur.

————————————