[Cite as *State v. Hipps*, 2026-Ohio-1850.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 25AP-476<br>(C.P.C. No. 23CR-4435) |
| Ismayl I. Hipps, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on May 21, 2026

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Darren M. Burgess*, for appellee.

**On brief:** *Brian Rigg*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Ismayl I. Hipps, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to jury verdicts finding him guilty of two counts of murder, with firearm specifications, and a trial court verdict finding him guilty of one count of having weapons while under disability. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} As of August 2023, Hipps lived at a sober-living house located on Daily Road in Columbus, along with Anthony L. Davis and three other men. In the early morning hours of August 12, 2023, Columbus Division of Police officers responded to a report of a shooting at the sober-living house. The responding officers found Davis in his bedroom, suffering

from a gunshot wound to the face. Davis was transported to the hospital and died six days later. Hipps was arrested and the Franklin County Grand Jury indicted him on two counts of murder, both unspecified felonies in violation of R.C. 2903.02, each with firearm specifications, and one count of having weapons under disability, a third-degree felony in violation of R.C. 2923.13.

{¶ 3} Hipps waived his right to a jury trial on the having weapons while under a disability charge. A jury trial was conducted on the two murder charges.

{¶ 4} At trial, a Columbus Police sergeant testified she was dispatched to the sober-living house in the early morning hours of August 12, 2023, in response to a reported shooting. When the sergeant arrived, she found Davis in his bedroom, lying across the bed and gasping for breath. A search of Davis's bedroom resulted in the discovery of a projectile and a shell casing, but no weapon. Hipps was not present when police arrived, but the three other residents of the sober-living house were present. Gunshot residue tests were performed on those three men and each of those tests returned a negative result.

{¶ 5} Eleven days after the shooting, Hipps was arrested at his girlfriend's home on South Champion Avenue. A search of the girlfriend's home after the arrest resulted in the discovery of a nine-millimeter handgun with a loaded magazine and a live round in the chamber. The handgun and magazine were swabbed to test for the presence of DNA.

{¶ 6} A firearms examiner from the Columbus Police Crime Laboratory testified that the shell casing and projectile recovered from the sober-living house were fired from the handgun recovered from Hipps's girlfriend's house. A forensic scientist from the DNA section of the crime laboratory testified that Hipps's DNA matched a DNA profile found on the sample taken from the handgun. Davis's DNA did not match the sample taken from the handgun. The forensic scientist further testified that the sample taken from the handgun's magazine contained a mixed DNA profile, and that Hipps's DNA matched the major contributor to the mixed profile. The minor contributor to the mixed profile contained insufficient information for a conclusion to be drawn and, therefore, Davis could not be excluded as a minor contributor to the mixed profile.

{¶ 7} A Franklin County deputy coroner testified that Davis's death resulted from a perforating gunshot wound to the head caused by a projectile that entered through his right cheek and exited through his left scalp. The deputy coroner described the range from

which Davis was shot as "indeterminate." (Tr. Vol. 3 at 445.) He explained that the gunshot entry wound did not have the soot deposits or searing that would be expected for a close contact shot, where the gun is pressed against the skin. He further explained that the area around the entry wound also lacked the small abrasions caused by gunpowder striking the skin that would be expected for an "[i]ntermediate" range shot, where the gun was "a few inches to a couple feet away from" the entry wound. (Tr. Vol. 3 at 447.) The deputy coroner also testified that Davis had a blood alcohol content of 0.199 at the time he was transported to the hospital.

{¶ 8} Columbus Police Detective Mark Smith testified that witnesses indicated there had been a verbal altercation between Davis and Hipps immediately prior to the shooting. The altercation between Hipps and Davis began in the street outside the house, continued onto the front porch, into the house, and ultimately into Davis's bedroom in the house.

{¶ 9} Detective Smith also testified that witnesses indicated Davis had been involved in a dispute with the residents of the house across the street from the sober-living house, regarding Davis's relationship with the woman who lived across the street. Detective Smith stated there was information indicating that Hipps had attempted to resolve the dispute between Davis and the neighbor. Detective Smith further testified there was information that, when speaking with the neighbor, Hipps had lifted his shirt to display a gun in his waistband and told the neighbor he would resolve the situation. Hipps's counsel objected to this testimony, arguing it was inadmissible hearsay. The trial court overruled the objection and Hipps's counsel requested a mistrial, which the court denied.

{¶ 10} Recordings of three telephone calls Hipps made to his girlfriend from the Franklin County jail on the day he was arrested were played for the jury. In the first call, Hipps stated he was not present when the shooting occurred. When the girlfriend told Hipps she could not go back into her house because she was waiting for the police to conduct a search, Hipps told her there was a "hot piece" in one of the bedrooms and asked if the girlfriend understood what he meant. (Tr. Vol. 3 at 580.) Detective Smith testified that "hot piece" meant a wanted firearm. During the first call, Hipps stated it was all over for him if police found the firearm. He told his girlfriend he needed her to retrieve the firearm before police could find it. In the second call, placed immediately after the first call

ended, his girlfriend told Hipps the police had just arrived with a search warrant. Hipps said he hoped police did not find the firearm. In the third call, made approximately three and a half hours later, Hipps asked if police found anything in the house. His girlfriend indicated police had found the firearm. Hipps expressed frustration that it had been found but asserted police could not prove it was his. Hipps then stated "[n]ow I'm going to have to use self-defense." (State's Ex. O3 at 14:45.) Hipps also states "[i]t's his gun but I shot it and I kept it." (State's Ex. O3 at 15:09-15:14.) Hipps suggested that if he asserted self-defense, he would have a problem explaining why he still had the weapon and then stated he kept the gun because he did not know what else to do with it.

{¶ 11} Following plaintiff-appellee State of Ohio's presentation, Hipps testified on his own behalf. He admitted to prior convictions for burglary, receiving stolen property, and a firearm-related offense, and stated that he had served time in prison. He was placed in the sober-living house as a condition of his parole and had lived there for approximately one year. Hipps asserted he was committed to maintaining his sobriety. Hipps testified Davis had been a resident of the sober-living house for a couple of weeks prior to the shooting. Hipps explained that his first interaction with Davis occurred in Davis's room, where Davis was playing a video game and drinking wine, which violated house rules. Hipps also testified about a second interaction that occurred approximately a week before the shooting, when he, Davis, and another resident were on the back patio of the house in the afternoon. Hipps testified that while the three of them were hanging out, a man who lived across the street came to the house and yelled at Davis about sending inappropriate photographs to the man's wife. The other resident calmed the neighbor down, and he went back to his house across the street.

{¶ 12} Hipps testified that on the day of the shooting he arrived home at around 1:00 a.m. to find Davis, another resident, and the other resident's girlfriend outside the house having a discussion about the neighbor. Hipps claimed Davis "seemed like he was intoxicated and very mad." (Tr. Vol. 4 at 663.) Hipps testified he felt the need to be a peacekeeper in the dispute with the neighbor and to defuse the situation so no one would get into trouble. He claimed he went to the neighbor's house to apologize for Davis's conduct and told the neighbor he would handle it. Hipps testified he meant he would call the managers of the sober-living house the next day to see what could be done about Davis.

Hipps claimed Davis was still mad when he went back to the sober-living house and that he tried to calm Davis down and escorted him into the house. Hipps testified Davis was intoxicated, aggressive, angry, and tried to punch him. Hipps claimed he was able to get Davis into his bedroom and close the door. Hipps testified he told Davis to lie down and calm down, but Davis yelled at him and tried to punch him again. Hipps then pushed Davis down onto the bed. Hipps testified Davis got up and grabbed a handgun from beside the bed, then pointed the gun at him. Hipps claimed he was scared, and his first thought was to get the gun away from Davis. Hipps testified he took the gun from Davis and a struggle ensued:

> Q. Okay. And is that what you tried to do, get the gun out of his hand?
>
> A. Yes, sir.
>
> Q. Then what happened?
>
> A. After I get the gun out of his hand, I pushed him on the bed again and I grabbed the gun. And I got on top of him, I pointed the gun at him and told him to calm down. He was still being aggressive trying to get the gun from me. He smacked the gun, and the gun went off.
>
> Q. The gun discharged?
>
> A. Yes, sir.

(Tr. Vol. 4 at 670.) On cross-examination, Hipps stated Davis "smacked the gun, and it went off because I had my hand on the trigger." (Tr. Vol. 4 at 690.) Hipps asserted that after he took the gun away, Davis was laying on his back on the bed, and he was on his knees on the bed over Davis.

{¶ 13} Hipps testified he was scared after the gun fired, so he went downstairs and told another resident to call police. He then fled to his girlfriend's house, where he remained until he was arrested. Hipps claimed he took the gun with him because the other residents of the house also had criminal records and he did not know what they might do with it. He also stated that he did not call police himself because he was scared and had a criminal record.

{¶ 14} Hipps testified he was not truthful in the first jail telephone call when he told his girlfriend that he was not present when the shooting occurred, because he did not want to cause her stress. However, Hipps claimed he was truthful in the third jail telephone call when he told her the gun belonged to Davis and that he had acted in self-defense.

{¶ 15} The jury found Hipps guilty of both counts of murder, as charged in Counts 1 and 2 of the indictment, and the firearm specifications associated with those charges. The trial court found Hipps guilty of having weapons while under a disability.

{¶ 16} The trial court concluded that the murder counts merged for purposes of sentencing. The state elected to proceed on Count 2, which alleged that Hipps caused Davis's death as a proximate result of committing or attempting to commit the offense of felonious assault. The court imposed a sentence of 15 years to life imprisonment on the murder conviction, plus 3 years on the associated firearm specification, and 36 months on the weapons under disability charge. All sentences were imposed consecutively for a total sentence of life imprisonment with the first possibility of parole after 21 years.

## II. Assignments of Error

{¶ 17} Hipps appeals and assigns the following two assignments of error for our review:

> [I.] THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A MISTRIAL BASED UPON INADMISSABLE CHARACTER EVIDENCE[.]
>
> [II.] THE CONVICTIONS IN THIS CASE WERE AGAINST THE WEIGHT AND SUFFICIENCY OF EVIDENCE[.]

## III. Discussion

### A. Denial of motion for mistrial

{¶ 18} In his first assignment of error, Hipps argues the trial court erred by denying his motion for a mistrial following testimony from Detective Smith about Hipps displaying a firearm to the neighbor before the shooting. On cross-examination, Hipps's attorney questioned Detective Smith about how the house across the street from the sober-living house on Daily Road related to the shooting. Detective Smith testified that from witness interviews police learned of an altercation between Davis and the neighbor who lived across the street. The investigation also indicated that before the shooting there was a verbal altercation between Davis and Hipps that began outside the house and then continued into

the house and into Davis's bedroom. Detective Smith also testified that police learned from witnesses that Hipps had attempted to resolve the conflict between Davis and the neighbor. Then, on redirect examination, Detective Smith testified about information that developed during his investigation regarding Hipps's efforts to resolve the situation between Davis and the neighbor:

> Q: So, Detective, I'm going to ask you again -- [defense counsel] asked you questions during the course of your investigation. You developed information about how [Hipps] went over to the house to deescalate the situation. Through the course of your investigation, how did he go over and deescalate the situation?
>
> A. Through the information we obtained, he went to the neighbor. He told the neighbor that he was going to resolve it and displayed -- lifted up his shirt showing a weapon in his waistband.

(Tr. Vol. 4 at 627-28.) Hipps's counsel objected and moved for a mistrial after this testimony but the court overruled the objection and denied the motion for mistrial. On appeal, Hipps argues a mistrial was warranted because Detective Smith's testimony was hearsay and prejudicial character evidence.

{¶ 19} "A trial court must declare a mistrial only 'when the ends of justice so require and a fair trial is no longer possible.' " *State v. Adams*, 2015-Ohio-3954, ¶ 198, quoting *State v. Garner*, 1995-Ohio-168, ¶ 39. We review the denial of a motion for mistrial for abuse of discretion. *Id.* A defendant must demonstrate material prejudice to establish an abuse of discretion in the denial of a motion for mistrial. *Id.*

{¶ 20} On appeal, Hipps argues Detective Smith's testimony was both hearsay and prejudicial character evidence. However, in his arguments to the trial court in support of the motion for mistrial, Hipps's counsel only asserted that the testimony constituted hearsay and made no claim of improper character evidence. "A first principle of appellate jurisdiction is that a party ordinarily may not present an argument on appeal that it failed to raise below." *State v. Wintermeyer*, 2019-Ohio-5156, ¶ 10. *See State v. Glaros*, 170 Ohio St. 471 (1960), paragraph one of the syllabus ("It is a general rule that an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such

error could have been avoided or corrected by the trial court."). Consistent with this principle, this court has stated "[i]t is well-settled that we will not consider an argument raised for the first time on appeal." *State v. Villareal*, 2022-Ohio-1473, ¶ 22 (10th Dist.). Because Hipps failed to argue before the court that Detective Smith's testimony constituted prejudicial character evidence, we decline to consider that argument for the first time on appeal. *See State v. Pratts*, 2016-Ohio-8053, ¶ 43 (8th Dist.) (declining to consider arguments in support of claim that trial court erred by denying motion for mistrial because those arguments had not been made at the trial level in the motion for mistrial); *State v. Urso*, 2011-Ohio-4702, ¶ 76-77 (11th Dist.) ("Now, for the first time on appeal, appellant argues the trial court should have granted a mistrial because [a 911 call transcript] did not correctly represent the recording of the 911 call. . . . Because appellant did not argue below that the transcript was inaccurate, the trial court was not given an opportunity to consider this argument and to correct any resulting error. Appellant therefore failed to preserve this argument for appeal.").

{¶ 21} Hipps asserted a hearsay argument before the trial court in support of his motion for mistrial and so that argument is properly before us on appeal. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). Hearsay is inadmissible unless an exception applies. Evid.R. 802. "Where an out-of-court statement is offered without reference to its truth, the statement is not hearsay." *State v. Payne*, 2003-Ohio-4891, ¶ 63 (10th Dist.).

{¶ 22} Hipps argues Detective Smith's testimony about him displaying a gun to the neighbor was hearsay that violated his right to confront witnesses and prejudiced his right to a fair trial. The state claims Detective Smith's testimony was not hearsay because it was not offered for the truth of the matter asserted. Rather, the state asserts Detective Smith was explaining his investigation and how Hipps came to be a suspect.

{¶ 23} This court has held that statements offered to explain a police officer's conduct while investigating a crime are not hearsay because they are not offered for the truth of the matter asserted and instead are offered as an explanation of the investigative process. *State v. Aekins*, 2023-Ohio-322, ¶ 109 (10th Dist.). The Supreme Court of Ohio has explained that "[t]estimony offered to explain police conduct is admissible as

nonhearsay if it satisfies three criteria: (1) 'the conduct to be explained [is] relevant, equivocal, and contemporaneous with the statements,' (2) the probative value of the statements is not substantially outweighed by the danger of undue prejudice, and (3) 'the statements cannot connect the accused with the crimes charged.' " *State v. Ford*, 2019-Ohio-4539, ¶ 215, quoting *State v. Ricks*, 2013-Ohio-3712, ¶ 27. We reject the state's argument that Detective Smith's testimony was an admissible non-hearsay explanation of police conduct because testimony suggesting that Hipps had a gun prior to the shooting would connect him with the crimes charged.

{¶ 24} Although we reject the state's "investigative explanation" argument, that does not end our analysis. Assuming for purposes of analysis that Detective Smith's testimony about Hipps displaying a gun to the neighbor was hearsay, we conclude Hipps has failed to demonstrate that a mistrial was warranted because a fair trial was no longer possible. The state was not required to establish that the gun belonged to Hipps or that it was in his possession before the shooting in Davis's bedroom. As explained more fully below, the jury could have believed Hipps's account of what occurred in the bedroom (i.e., that Davis initially pulled the gun on Hipps before Hipps took it away from him) and still could have concluded that Hipps was guilty of felony murder based on his actions after taking the gun away from Davis. Therefore, Hipps has not established that admission of this portion of Detective Smith's testimony prevented him from having a fair trial and that the trial court abused its discretion by denying his motion for a mistrial. *See State v. Poindexter*, 2021-Ohio-1499, ¶ 42 (10th Dist.) ("[E]ven assuming the admission of Williams' testimony was erroneous, Poindexter has not shown that the record affirmatively demonstrates that he was prejudiced by Williams' testimony or was prevented from having a fair trial.").

{¶ 25} Accordingly, we overrule Hipps's first assignment of error.

**B. Sufficiency and weight of the evidence supporting conviction**

{¶ 26} In his second assignment of error, Hipps asserts the jury's verdicts on the murder charges were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 27} "Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 2010-Ohio-1881, ¶ 36 (10th Dist.), citing *State v. Thompkins*, 1997-Ohio-52, ¶ 33. When reviewing a

challenge to the sufficiency of the evidence, we must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 1997-Ohio-355, ¶ 49, fn. 4. Where the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id.*

{¶ 28} While a sufficiency of the evidence challenge requires a determination of whether the evidence is legally sufficient to support the verdict as a matter of law, a manifest weight challenge "addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38. When reviewing the weight of the evidence, we "may not merely substitute [our] view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. McCrary*, 2011-Ohio-3161, ¶ 12 (10th Dist.). In considering the weight of the evidence, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *State v. Cattledge*, 2010-Ohio-4953, ¶ 6 (10th Dist.), quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). A manifest weight challenge should be sustained only in an exceptional case where the evidence weighs heavily against the conviction. *State v. K.A.C.*, 2024-Ohio-1139, ¶ 60 (10th Dist.). Reversal of a jury verdict on manifest weight grounds requires unanimous concurrence of all three appellate judges on the panel reviewing the case. *Id.*

{¶ 29} The first count of the indictment charged Hipps with purposeful murder, by purposely causing Davis's death. The second count of the indictment charged Hipps with felony murder, by causing Davis's death as the proximate result of committing or attempting to commit the offense of felonious assault. The jury found Hipps guilty of both counts as charged in the indictment. The trial court concluded that the purposeful murder and the felony murder counts merged for purposes of sentencing. The state elected to

proceed with sentencing on the felony murder count. Accordingly, we need not address Hipps's challenge to the sufficiency or weight of the evidence supporting the merged purposeful murder count because any error would be harmless beyond a reasonable doubt. *State v. Young*, 2020-Ohio-462, ¶ 86 (10th Dist.). *See State v. Lammkin*, 2019-Ohio-682, ¶ 15, fn. 1 (10th Dist.) ("Because the murder count merged with the aggravated murder count at sentencing, we need not address Lammkin's manifest weight challenge to the murder count."); *State v. Worley*, 2016-Ohio-2722, ¶ 23 (8th Dist.) (refusing to individually review evidence supporting jury's findings of guilt on merged counts because no sentence was imposed on the merged counts, and reasoning that a conviction consists of both a guilty verdict and imposition of a sentence); *State v. Montgomery*, 2014-Ohio-4354, ¶ 39 (10th Dist.) (holding that when counts merge any error in the jury's verdict on the merged count is rendered harmless beyond a reasonable doubt).

{¶ 30} The statute defining the offense of felony murder provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit" a first-degree or second-degree felony that is not voluntary or involuntary manslaughter. R.C. 2903.02(B). In this case, the indictment alleged that Hipps caused Davis's death as a proximate result of committing or attempting to commit the offense of felonious assault. The statute defining felonious assault provides, in relevant part, that no person shall knowingly cause serious physical harm to another or cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordinance. R.C. 2903.11(A)(1) and (2). A person acts knowingly "when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "When determining whether a defendant acted knowingly, his state of mind must be determined from the totality of the circumstances surrounding the alleged crime." *State v. Fox*, 2018-Ohio-501, ¶ 14 (10th Dist.).

{¶ 31} The Supreme Court has held that "[f]elony murder as defined in R.C. 2903.02(B), with the underlying offense of violence being felonious assault, is supported by evidence that establishes that the defendant knowingly caused physical harm to the victim." *State v. Miller*, 2002-Ohio-4931, syllabus. This court has held that "[e]vidence that a defendant fired a gun in a person's direction is sufficient evidence that

the defendant acted knowingly for the purpose of a felonious assault conviction." *Fox* at ¶ 14.

{¶ 32} Hipps provided the only testimony regarding what occurred inside Davis's bedroom at the time of the shooting. Hipps claimed he escorted Davis into the house and into Davis's bedroom while trying to calm him down. Hipps asserted he told Davis to lie down and calm down, but Davis yelled at him and tried to punch him, so he pushed Davis down onto the bed. Hipps testified that Davis then retrieved a gun and pointed it at him but that he was able to get the gun away from Davis. Hipps claimed he pushed Davis down on the bed again and was on his knees over Davis when he pointed the gun at Davis while telling him to calm down. Hipps claimed Davis was still being aggressive and trying to get the gun from him, and that the gun fired when Davis smacked it. Hipps admitted he had his finger on the trigger of the gun at the time. The forensic evidence tended to contradict Hipps's claims that Davis initially had the gun, because Davis's DNA was not found in a sample taken from the gun. Additionally, the deputy coroner testified there were no indications that the gun was in contact with Davis nor within a couple feet of Davis when the shot was fired. This evidence tends to contradict Hipps's claim that the gun fired when Davis smacked it, because Davis would have needed to be within arm's reach of the gun (i.e., within a few feet of his face, where the bullet struck) to make contact with the gun and cause it to discharge. Based on the evidence presented, if viewed in the light most favorable to the prosecution, the jury could reasonably believe that Hipps knowingly caused physical harm to Davis that resulted in his death. *See Miller* at ¶ 32. *See also State v. King*, 2025-Ohio-918, ¶ 32 (10th Dist.) (concluding jury did not clearly lose its way by finding defendant guilty, despite defendant's claim that a firearm discharged when the victim struggled with him and tried to take it away).

{¶ 33} Hipps argues the evidence was insufficient to support his conviction because the state failed to refute his assertion that he acted in self-defense. Historically, self-defense was an affirmative defense, requiring a defendant to prove the elements of self-defense by a preponderance of the evidence. *State v. Patterson*, 2025-Ohio-280, ¶ 37 (10th Dist.). The General Assembly amended the law in 2019, however, and R.C. 2901.05(B)(1) now provides in relevant part that if evidence is presented at trial that tends to support a claim of self-defense or defense of another, "the prosecution must prove beyond a reasonable doubt that

the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be." Under this standard, "when an accused presents evidence that tends to support that the accused used force against another in self-defense, the state must disprove at least one of the elements of self-defense beyond a reasonable doubt." *Id.* at ¶ 38. "The state's new burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal[.]" *State v. Messenger*, 2022-Ohio-4562, ¶ 27.

{¶ 34} When a defendant asserts he used deadly force in self-defense, as in this case, the state must prove beyond a reasonable doubt at least one of the following elements to negate the self-defense claim: (1) the accused was at fault in creating the situation giving rise to the affray, (2) the accused did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, or (3) the accused violated a duty to retreat or avoid the danger. *Patterson* at ¶ 40. A self-defense claim generally presents an issue of credibility that is best resolved by the trier of fact. *Id.* at ¶ 45. A conviction is not against the manifest weight of the evidence when the trier of fact believes the state's version of events over the defendant's and rejects the defendant's claim of self-defense. *Id.*

{¶ 35} With respect to the first element, not being at fault in creating the situation does not simply mean not being the immediate aggressor. *Id.* at ¶ 41. Courts have held that a person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense, and that a defendant may be at fault when he chooses to confront the victim or refuses to move away from the victim even if the defendant's action was otherwise completely lawful. *Id.* In this case, Hipps admitted in his testimony that he voluntarily inserted himself into the dispute between Davis and the neighbor at a time when Davis seemed "intoxicated and very mad." (Tr. Vol. 4 at 663.) Hipps also admitted he told the neighbor he would handle the situation, although he claimed that meant contacting management for the facility the following day. Hipps stated Davis was intoxicated, aggressive, and angry, and tried to punch him when he was trying to calm Davis down and get him back into the house; however, Hipps voluntarily continued to engage with Davis. Hipps claimed Davis tried to punch him again after they entered Davis's bedroom, but rather than leaving, Hipps pushed Davis down onto the bed. Based on this evidence, the

jury could have reasonably concluded that Hipps was at least partially at fault for creating the situation that resulted in Davis being shot. *See Patterson* at ¶ 49.

{¶ 36} With respect to the second element, a defendant's use of deadly force must be warranted under the circumstances and proportionate to the perceived threat. *Id.* at ¶ 43. The defendant must have used only the force necessary to repel the attack and not have used excessive force. *Id.* Hipps testified that *after* he took the gun away from Davis, he pushed Davis back down onto the bed, pointed the gun at Davis while holding his finger on the trigger, and told Davis to calm down. Hipps asserted he was on his knees on the bed when this occurred, indicating he was in a position over Davis. If the jury believed this testimony, it could have reasonably concluded that once Hipps took the gun away from Davis, thereby eliminating the threat of Davis shooting him, it was excessive and disproportionate to then point the gun at Davis. *See, e.g., State v. Huguley*, 2017-Ohio-8300, ¶ 48 (9th Dist.) ("Under Mr. Huguley's version of the events, Ms. Williams was the initial aggressor and he believed he was in imminent danger of death or great bodily harm, thus justifying his use of deadly force. But, even under Mr. Huguley's version of the events, at the point in time that he stabbed Ms. Williams, she no longer had a weapon because he had taken the knife from her."); *State v. Keil*, 2017-Ohio-593, ¶ 42 (5th Dist.) ("Keil testified that Earle returned and pointed the gun at both Keil and Keil's brother. . . . However, the threat ended when Earle was disarmed and the handgun fell to the ground. Keil testified that he picked up the handgun from the ground and proceeded to hit Earle in the head with the object. Therefore, the jury could have found that Keil's use of deadly force at that point was disproportionate to the threat that he or his brother were facing at that point in time."); *State v. Hendrickson*, 2009-Ohio-4416, ¶ 37 (4th Dist.) ("In other words, arguably Hendrickson may have been justified in using deadly force until he was safe from Blankenship's efforts to stab him. Once he eliminated her threat to his life or serious bodily injury, he had to stop using deadly force.").

{¶ 37} Even if the jury believed Hipps's testimony, it was within the province of the jury to conclude that Hipps was at least partially at fault for creating the situation that led to Davis being shot and that Hipps did not act with proportionate force when he pointed the gun at Davis after taking it away from him. It was also within the province of the jury to assess Hipps's credibility, based on his testimony and the recorded jail telephone calls,

when determining whether to believe Hipps's claim that the gun fired because Davis smacked it. Based on our review of the evidence we cannot conclude the jury lost its way and created a manifest miscarriage of justice when it found the state proved beyond a reasonable doubt that Hipps did not act in self-defense.

{¶ 38} Hipps further argues the jury lost its way in convicting him because it relied on Detective Smith's testimony that the neighbor stated Hipps displayed a gun in his waistband and told the neighbor he would handle the situation. However, we cannot conclude that the jury's decision was against the manifest weight of the evidence. As explained above, in his testimony, Hipps admitted to taking the gun away from Davis and pointing it at Davis with his finger on the trigger, although Hipps claimed the gun fired because Davis smacked it while trying to get it away from him. The forensic evidence cast doubt on Hipps's claim that Davis originally had the gun, because Davis's DNA was not found on the sample taken from the gun, and on Hipps's claim that the gun fired because Davis smacked it. The recorded jail telephone calls also cast doubt on Hipps's account of the shooting, because Hipps did not suggest he acted in self-defense until after learning that police had found the gun. Because Hipps provided the only direct testimony about what occurred in Davis's bedroom, the outcome largely turned on the jury's assessment of Hipps's credibility. Reviewing all the evidence presented in the case, we cannot conclude that this was an exceptional case where the evidence weighed heavily against conviction and where the jury clearly lost its way in finding Hipps guilty.

{¶ 39} Accordingly, we overrule Hipps's second assignment of error.

## IV. Conclusion

{¶ 40} For the foregoing reasons, we overrule Hipps's two assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BOGGS, P.J., and MENTEL, J., concur.

————————